**SOCIALIST WORKERS PARTY et al., Plaintiffs,**

v.

**ATTORNEY GENERAL OF the UNITED STATES et al., Defendants.**

**No. 73 Civ. 3160.**

United States District Court,
S. D. New York.

March 29, 1974.

Leonard B. Boudin, Rabinowitz, Boudin & Standard, Herbert Jordan, New York City, for plaintiffs.

John J. Wilson, David G. Bress, Washington, D. C., for defendants.

## OPINION

GRIESA, District Judge.

This is an action brought by the Socialist Workers Party ("SWP"), the Young Socialist Alliance ("YSA") and certain individuals, on their own behalf, and allegedly representing a class of approximately 100,000 persons consisting of members of the SWP and the YSA. The action is brought under the Constitution and various federal statutes, alleging that defendants conspired to deprive plaintiffs and their class of rights to participate in the electoral process and that defendants are responsible for illegal burglary, mail tampering and other wrongful activities.

The defendants named in the complaint include President Nixon and certain former officials and employees of the Government, as follows:

Robert C. Mardian
John Mitchell
John W. Dean, III
H. R. Haldeman
John D. Ehrlichman
Tom Charles Huston
Jacob Nogi

In addition, the complaint names the following defendants by their official titles:

Attorney General of the United States
Secretary of the Treasury
Secretary of Defense
Postmaster General
Secretary of the Army
Director of the Federal Bureau of Investigation
Director of Central Intelligence
Director of Secret Service
Director of Defense Intelligence Agency
Director of National Security Agency
Director of Alcohol, Tobacco and Firearms Division (U.S. Treasury)
Director of Selective Service System
Civil Service Commissioners
Members of the United States Board of Parole

Defendants Haldeman, Ehrlichman and Mardian move for dismissal of the action on the ground of lack of personal jurisdiction. The motions are granted, without prejudice to the making of a later motion by plaintiffs under F.R.Civ.P. 21 to join these three parties as defendants when and if the record satisfactorily demonstrates a basis for jurisdiction.[1]

According to the complaint, these three defendants occupied the following posts in the Government:

(1) Haldeman was White House Chief of Staff from January 1969 to April 30, 1973;

(2) Ehrlichman was Assistant to the President for Domestic Affairs from January 1969 to April 30, 1973;

(3) Mardian was Assistant Attorney General in charge of the Internal Security Division of the Department of Justice from November 7, 1970 until March 1972.

Although plaintiffs do not refer to this in the complaint, their memorandum in opposition to Mardian's motion asserts that from March 1972 until November 10, 1972, Mardian was an official in the Committee to Re-elect the President.

Admittedly Haldeman, Ehrlichman and Mardian do not reside in New York and were not served in this State. They now reside in the states of California, Washington and Arizona respectively. Haldeman was served on August 2, 1973 in Washington, D. C. Ehrlichman was served on July 31, 1973 in Great Falls, Virginia. Mardian was served on September 17, 1973 in Phoenix, Arizona.

The only arguable basis for jurisdiction over these three defendants is F.R. Civ.P. 4(e), which authorizes a federal court to make use of state law for service on non-residents. The New York statute relied upon is CPLR § 302(a)(2), McKinney's Consol.Laws, c. 8, which permits out-of-state service on a non-resident who has committed "a tortious act within the state".

The complaint alleges that since 1948, when the so-called Attorney General's List was published naming the SWP as a subversive organization, various officers of the Government have agreed upon a campaign of harassment against this political party (pars. 33, 37–38). The complaint further alleges that during the months of July through November 1970, defendants Haldeman, Ehrlichman and Mardian, together with other defendants, agreed to intensify governmental harassment of the SWP by use of warrantless electronic surveillance, mail covers and burglaries (pars. 34–35). In paragraph 36 of the complaint, Haldeman, Ehrlichman and Mardian are joined in an omnibus charge, alleging that these defendants caused the events described in 38 separately numbered paragraphs in the complaint.

It should be pointed out that none of the acts alleged in these 38 paragraphs of the complaint are said to have been actually performed by Haldeman, Ehrlichman or Mardian. The allegations are of burglaries, mail covers and other forms of alleged harassment carried out

---

1. The motion of defendant Tom Charles Huston to dismiss for lack of personal jurisdiction was granted on November 27, 1973.

by employees and agents of the FBI, the Civil Service Commission, the United States Army, the Selective Service System, the Board of Parole, the Postmaster General, the Treasury Department, the CIA, the Department of Defense and the National Security Agency. It is alleged that defendants Haldeman, Ehrlichman, Mardian and other individual defendants "knew that some or all of these events" were about to occur (par. 75).

While the 38 paragraphs contain certain broad allegations of illegal activity in New York, Los Angeles, Seattle and other cities, there is only one allegation of a specific act occurring in New York. It is alleged that on or about May 24, 1973 "unidentified persons" broke into the apartment of plaintiff Norman Oliver in Brooklyn and rifled his files pertaining to SWP business and his then campaign for Mayor of New York City on the SWP ticket (par. 68). The complaint alleges on information and belief that the persons who planned and participated in this and certain other alleged burglaries were agents of the FBI, the Treasury Department, the CIA, the Department of Defense, the National Security Agency, or agents of all of them (par. 69).

Each of the moving defendants has filed a brief affidavit denying that he ever participated in or authorized any illegal, tortious or unconstitutional action with respect to the SWP or the YSA or any of the individual plaintiffs in this action. Each has denied committing any tortious act within New York either personally or through an agent.

Plaintiffs have responded to these motions by referring to three activities allegedly carried on by Government agents in New York. Plaintiffs claim that such activities were performed pursuant to an alleged conspiracy of which defendants Haldeman, Ehrlichman and Mardian were members, and that on this basis these defendants can be said to have committed tortious acts within the State of New York.

First, plaintiffs refer to the alleged burglary of plaintiff Oliver's apartment mentioned in the complaint. Second, plaintiffs refer to a mail cover carried out by the FBI respecting the headquarters of the SWP in New York City. Plaintiffs originally learned about this mail cover from certain litigation in the Federal District Court in New Jersey, Paton v. LaPrade (Civ.Action No. 1091–73), which deals with an incident of mail surveillance occurring in early 1973. A document produced in discovery in the present action shows that the Acting Director of the FBI ordered this mail cover on January 11, 1973. The third type of activity relied on by plaintiffs is a "Disruption Program" by the FBI against the SWP. Plaintiffs have obtained a memorandum dated April 28, 1971 from the Director of the FBI to the Albany office of the FBI, directing that the Disruption Program for the SWP and other counterintelligence programs for other organizations be discontinued immediately, but stating that recommendations for counterintelligence action in exceptional cases will be considered by the FBI in the future on an individual basis.

Plaintiffs naturally argue that the April 28, 1971 memorandum proves there was a Disruption Program carried out in New York against the SWP by the FBI prior to the time of the memorandum. Plaintiffs also assert that they "will present evidence that it operates even now" (Plaintiffs' Memorandum—Mardian Motion p. 2, n. 2). But plaintiffs have not cited on this motion any specific manifestations of the Disruption Program, unless the alleged mail cover and burglary of Oliver's apartment in 1973 are claimed to be such.

■■ Plaintiffs are correct that under certain circumstances a person may be subjected to jurisdiction under CPLR § 302(a)(2) on the theory that his co-conspirator is carrying out activities in New York pursuant to the conspiracy. American Broadcasting Co. v. Hernreich, 40 A.D.2d 800, 338 N.Y.S.2d 146

(1st Dep't 1972) and Neilson v. Sal Martorano, Inc., 36 A.D.2d 625, 319 N.Y.S.2d 480 (2d Dep't 1971). But, in order for a plaintiff to subject an out-of-state defendant to jurisdiction in New York, it is necessary to do more than put forward an unsupported allegation. The plaintiff must come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York. LaMarr v. Klein, 35 A.D.2d 248, 315 N.Y.S.2d 695 (1st Dep't 1970). Although it is not necessary upon a jurisdictional motion for the plaintiff to finally prove the tortious act in question, our Court of Appeals has stated that, in order to establish "threshold jurisdiction", the plaintiff must establish "prima facie" the relevant facts under CPLR § 302. United States v. Montreal Trust Co., 358 F.2d 239 (2d Cir. 1966), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966).

Plaintiff's factual record on the present motions consists of the following:

(1) Excerpts of testimony and documents from the Hearings Before the Select Committee on Presidential Campaign Activities of the United States Senate, 93d Cong. 1st Sess. (1973).

(2) Affidavit of Norman Oliver dated September 13, 1973.

(3) Defendant LaPrade's answers to interrogatories in Paton v. LaPrade.

(4) Memorandum dated April 28, 1971 from the Director of the FBI to the FBI office in Albany, New York—produced on discovery in the present action.

(5) Memorandum dated January 11, 1973 from the Acting Director of the FBI to the Assistant Postmaster General, Inspection Service—produced on discovery in the present action.

After analyzing this record, I conclude that it does not provide any factual basis for connecting Haldeman, Ehrlichman or Mardian with any of the activities in New York relied upon by plaintiffs as grounds for jurisdiction. There is no indication from this record that Haldeman, Ehrlichman or Mardian ever visited New York in connection with any of these activities, or in connection with anything else relating to the SWP or the YSA. There is no indication that Haldeman, Ehrlichman or Mardian ever requested, or directed, or had any communications relating to the alleged FBI Disruption Program against the SWP in New York, the FBI mail cover for the SWP headquarters in New York, or the alleged burglary of Norman Oliver's apartment in Brooklyn. Not only is there a lack of direct evidence of any such facts, but there is a lack of any circumstantial evidence from which a rational inference of such facts can be drawn.

Plaintiffs rely heavily upon testimony and documents adduced at the Senate Committee hearings referred to above. Plaintiffs point to various materials about the so-called "Huston Plan" and other intelligence-gathering plans or programs. The trouble is that there is not one word about the SWP or the YSA, or any plans or operations directed against either of these groups, in the Senate Committee testimony or documents referred to by plaintiffs on the present motions. There is no indication from these materials that Haldeman, Ehrlichman or Mardian ever gave any attention to the SWP or the YSA. These Senate Committee materials simply provide no basis for inferring that the Huston Plan or any of the other plans or operations with which Haldeman, Ehrlichman or Mardian may have been connected resulted in the FBI Disruption Program against the SWP, the 1973 mail cover against the SWP, or the May 1973 burglary of Norman Oliver's apartment.

It is true that documents before the Senate Committee indicate that the Huston Plan, under discussion in the summer of 1970, contemplated an expansion of intelligence collection activities

by the Government, including intensification of electronic surveillance of groups posing a threat to internal security, increased use of mail covers on selected internal security targets, and the use of surreptitious entries of facilities occupied by subversive elements. It is not clear from the materials furnished on the present motions what role Haldeman played in the Huston Plan. The documents indicate that Haldeman was a channel of communication between Huston and President Nixon. It appears that Haldeman attended a meeting in August 1970 with FBI Director Hoover and Attorney General Mitchell, although what transpired at this meeting is not shown. John Dean testified before the Senate Committee that at some point he was instructed by Haldeman to see what he could do to get the plan implemented.

Ehrlichman, in his testimony before the Senate Committee, stated in effect that he was not involved in the Huston Plan, although he heard of the "proposal" at a meeting in President Nixon's office attended by FBI Director Hoover and the heads of various intelligence agencies.

Mardian apparently did not participate in these discussions at all. He did not take his post at the Justice Department until November 1970.

Plaintiffs argue that the FBI mail cover of the SWP headquarters in 1973 and the burglary of Oliver's apartment in May of that year were activities of the type contemplated by the Huston Plan, and can therefore be presumed to have been carried out pursuant to that plan. I disagree. In the first place, the Senate Committee materials provided by plaintiffs would indicate that implementation of the Huston Plan was largely aborted. FBI Director Hoover strongly opposed the Huston Plan. John Dean's testimony states that Attorney General Mitchell also opposed the plan, except that Mitchell considered that an interagency evaluation committee might be useful to consolidate intelligence information gathered from various sources.

Dean testified that after he had received instructions from Haldeman and after he had discussed the matter with Mitchell, the idea of setting up the interagency evaluation committee was advanced as an "appropriate first step", and this committee was actually established in the Internal Security Division of the Justice Department. Ehrlichman testified that he heard that Hoover and Mitchell had scuttled the Huston Plan, although he was aware in the summer of 1970 of a proposal to set up an office in the Justice Department to bring together information from around the country about terrorism and street violence. According to Ehrlichman such a group was set up under Mardian's supervision. As far as the record on the present motions is concerned, this is basically where the matter of the Huston Plan is dropped.

Whatever significance the Huston Plan may have in other contexts, it is difficult to see how one could conclude from the present record that the FBI Disruption Program, the 1973 FBI mail cover of the SWP headquarters, or the Oliver burglary in May 1973 were connected with the Huston Plan.

As already described, FBI Director Hoover's memorandum of April 28, 1971 directs the *discontinuance* of the FBI's Disruption Program at that time. The information presented on the present motions does not indicate what the program consisted of prior to that time or when that program originated. But, in view of Hoover's opposition to the Huston Plan and the apparent failure to implement most of the operational aspects of the plan, it would be unrealistic to conclude that the FBI Disruption Program stemmed from the Huston Plan. After all, the SWP has been on the Attorney General's List since 1948, and there is no reason to believe that the Disruption Program was not something which came into being before the Huston Plan was ever discussed.

With regard to the FBI's mail cover carried out in early 1973 and the Oliver burglary of May 1973 by unknown per-

sons, there is clearly no basis for connecting these events with the largely aborted Huston Plan of 1970.

Plaintiffs do not limit their contentions to the Huston Plan. They assert that this plan was only one manifestation of a continuing conspiracy by Haldeman, Ehrlichman, Mardian and others to interfere with the rights of dissident political groups. Aside from the Huston Plan, only two types of activities involving the defendants are discussed in the Senate Committee materials presented on this motion. These are (1) activities involving Ehrlichman with respect to preventing unauthorized leaks of information from Government agencies, and (2) activities involving the Committee for the Re-election of the President.

However, there is not the slightest indication that any of these activities had any connection with the SWP. There is no basis whatever on the present record to draw an inference that such activities had anything to do with the FBI Disruption Program, the 1973 mail cover of the SWP headquarters or the May 1973 Oliver burglary.

An additional comment should be made at this point about Mardian. Plaintiffs assert that there is a definite connection between Mardian and the FBI Disruption Program relating to the SWP, because of the fact that Mardian was head of the Internal Security Division of the Justice Department and the FBI is an arm of that Department. But the FBI Disruption Program was *discontinued* in April 1971, shortly after Mardian took his post at the Justice Department in November 1970. There is not the slightest indication on the present record of what, if any, activities were carried out under the Disruption Program between November 1970 and April 1971. The present information relating to the Disruption Program affords no basis for asserting jurisdiction over Mardian.

Certain further points should also be noted about the Oliver burglary of May

24, 1973. This incident occurred following the resignations of Haldeman and Ehrlichman on April 30, 1973, and about a year after Mardian left the Justice Department in the spring of 1971 and some months after he left the Committee to Re-elect the President in November 1972. Moreover, evidence has not yet been developed actually connecting the Oliver burglary with any official or agency of the Federal Government. All that we now have is an affidavit from Mr. Oliver stating that he and his girl friend returned to their apartment on the evening of May 24, 1973, and found that the apartment had been entered through a window, that Oliver's belongings from his dresser had been piled on the floor, that the kitchen trash can had been emptied on the floor, that a file cabinet had been opened and files strewn on the floor, and that a ring belonging to the firl friend was missing, although other jewelry and equipment such as television and stereo sets were untouched.

The cases relied upon by plaintiffs involved factual situations sharply different from what is presented in the present case. For instance, in American Broadcasting Company, Inc. v. Hernreich, 40 A.D.2d 800, 338 N.Y.S.2d 146 (1st Dep't 1972), the plaintiff alleged specifically that the non-resident defendant had paid the New York defendant bribes to carry out certain specific illegal activities in New York. Moreover, the non-resident defendant had traveled to New York in connection with the transactions in question. In Neilson v. Sal Martorano, Inc., 36 A.D.2d 625, 319 N.Y.S.2d 480 (2d Dep't 1971) the plaintiff asserted in the complaint and in motions papers that the non-resident defendant was the sister of one of the New York defendants, and that this New York defendant had made certain specific fraudulant conveyances of property to the non-resident defendant. The Appellant Division held that these facts would justify a finding that the New York defendant acted as agent for the

non-resident defendant in committing tortious acts in New York.

Thus in each of these cases there were allegations and evidence of specific factual connections between the non-resident defendants and transactions occurring in New York. In the present case there are no allegations, much less evidence, of specific facts connecting Haldeman, Ehrlichman or Mardian with transactions in New York.

Plaintiffs argue that, if the record developed thus far in this case is insufficient to sustain jurisdiction over Haldman, Ehrlichman and Mardian, the Court should defer decision pending further discovery. Plaintiffs have initiated discovery against various Government agencies, a substantial amount of which has not yet been completed. The only discovery so far requested of Haldeman, Ehrlichman and Mardian is a demand for production of a document allegedly entitled "Special Report of the Interagency Committee on Intelligence, Ad Hoc" dated June 1970. The same request was addressed to other defendants.

Plaintiffs point to Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972), where the Court of Appeals reversed the District Court's dismissal of the action as to one defendant for lack of personal jurisdiction. The Court of Appeals held, among other things, that the District Court should have deferred decision until completion of certain discovery. In my view, the situation in Leasco is far different from the present case. The complaint in that case was that the defendants had conspired to cause Leasco to buy stock of Pergamon Press, a British corporation, for prices in excess of its true value. The agreement for the purchase was signed in New York on June 17, 1969. The non-resident defendant whose dismissal was reversed by the Court of Appeals was an English lawyer named Kerman, who was a director of Pergamon and a senior partner in the law firm which acted as solicitors for Pergamon. A junior partner of Kerman participated in the negotiations in New York leading up to the June 17, 1969 agreement. On the jurisdictional motion in the District Court, the plaintiffs asserted "upon information and belief" that Kerman had engaged in many communications with his junior partner and others in New York during the negotiations leading up to the agreement. Kerman denied that he had such communications. The plaintiffs asserted that Kerman had a substantial ownership interest in Pergamon shares both directly and as trustee. Kerman denied the trusteeship, although not the direct ownership. The plaintiffs had offered to submit interrogatories to Kerman in order to obtain information directly from him on these subjects.

Thus in Leasco plaintiffs had submitted detailed allegations and much evidentiary fact tending to connect Kerman with definite transactions occurring in New York. Whatever questions were open on the jurisdictional issue were narrow and well defined—questions which the Court of Appeals held should not have been resolved without giving the plaintiffs the opportunity to address their interrogatories to Kerman.

The present case is far different. Plaintiffs' invocation of New York's long-arm statute to serve Haldeman, Ehrlichman and Mardian in other states was based on nothing but speculation and conjecture on the essential issue of connecting these defendants with acts or transactions in New York.

To compel a defendant to remain in an action during discovery and other pre-trial proceedings, and participate in such proceedings, is an assertion of jurisdiction to some extent—and no trivial burden in a substantial case. Surely a plaintiff must make some specific factual showing in order to assert such jurisdiction. A plaintiff cannot be permitted to effect service of process on an out-of-state defendant on the mere basis that such plaintiff hopes somehow and somewhere to find enough facts to create grounds for jurisdiction. Basically, that is what has happened in the present case.

■ The burden of pleading and proving jurisdiction is upon the party asserting it. Unicon Management Corporation v. Koppers Co., 250 F.Supp. 850, 852 (S.D.N.Y.1966). If and when plaintiffs obtain, through discovery or otherwise, facts sufficient to assert jurisdiction over Haldeman, Ehrlichman or Mardian, plaintiffs may apply to the Court for leave to add such defendants as parties under F.R.Civ.P. 21.

### Conclusion

■ For the foregoing reasons the motions of defendants Haldeman, Ehrlichman and Mardian to dismiss the action for lack of personal jurisdiction are granted, without prejudice to a motion under F.R.Civ.P. 21 to add one or more of these parties as defendants if and when a jurisdictional basis can be shown.

So ordered.